**DOLL AMIR & ELEY LLP**
MICHAEL M. AMIR (SBN 204491)
mamir@dollamir.com
JASON B. BAIM (SBN 179377)
jbaim@dollamir.com
1888 Century Park East, Suite 1850
Los Angeles, California 90067
Tel:  310.557.9100
Fax: 310.557.9101

Attorneys for Plaintiff
IP GLOBAL INVESTMENTS AMERICA, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IP GLOBAL INVESTMENTS AMERICA, INC., a California corporation,<br><br>          Plaintiff,<br><br>v.<br><br>BODY GLOVE IP HOLDINGS, LP, a Delaware organization; MARQUEE BRANDS, LLC, a Delaware organization; and DOES 1 through 25, inclusive,<br><br>          Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT;**<br><br>**(2) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**(3) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**;<br><br>**(4) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br><br>**(5) DECLARATORY RELIEF**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

IP Global Investments America, Inc. ("IPG" or "Plaintiff"), through its counsel of record, hereby complains and alleges with knowledge as to its own conduct and on information and belief against defendants Marquee Brands, LLC ("Marquee Brands") and Body Glove IP Holdings, LP ("Body Glove IP") (collectively, "Defendants"), as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over the subject matter of this action pursuant to the consent of the parties.  Specifically, Paragraph 23 of the parties' License Agreement at the heart of this matter expressly provides that any legal action necessary to enforce or interpret the terms of the License Agreement "will be brought in the Los Angeles or Orange County Superior Court or in the Central District for the District of California, and the parties hereby submit to the jurisdiction of said courts."

2.     In addition, because Plaintiff is a citizen of California, and Defendants are citizens of Delaware, respectively, this Court also has original jurisdiction under 28 U.S.C. § 1332, in that this is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

3.     Venue in this district is proper pursuant to 28 U.S.C. § 1391, subdivisions (b) and (c), because both parties conduct business in this judicial district, and a substantial part of the events giving rise to the claims herein occurred in this judicial district and because Defendants' contacts with this judicial district are sufficient to subject it to personal jurisdiction.

**THE PARTIES**

4.     At all times relevant to this Complaint, plaintiff IP Global Investments America, Inc. ("IPG" or "Plaintiff"), was and is a California corporation.

5.     Plaintiff is informed and believes, and on that basis alleges, that defendant Body Glove IP Holdings, LP ("Body Glove IP"), is a limited partnership organized under Delaware law.

**COMPLAINT**

6.     Plaintiff is informed and believes, and on that basis alleges, that defendant Marquee Brands LLC ("<u>Marquee Brands</u>") is a limited liability company organized under Delaware law.

7.     The true names and capacities, whether individual, corporate, associate or otherwise, of defendant Does 1 through 25, inclusive, are unknown to Plaintiff, and Plaintiff therefore sues said defendants by such fictitious names.  Plaintiff will amend the Complaint to show the true names and capacities when they have been ascertained.

8.     Plaintiff is informed and believes, and on that basis alleges, that each of the defendants named herein as a Doe is in some way responsible for the acts and events alleged herein.

9.     Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Doe defendants, and each of them, were the agents, servants and/or employees of each other, aided and abetted each other, were part of the same enterprise, and were acting within the full course and scope of said agency, enterprise, relationship, and/or employment, and with the full knowledge and consent, either express or implied, of each of the other defendants.

## **NATURE OF THE CONTROVERSY**

10.     This is a classic case of "buyer's remorse" where a large and sophisticated private investment conglomerate acquired a controlling interest in the Body Glove brand, and not liking the Plaintiff's valid and longstanding license agreement assumed in the deal, has resorted to unlawful tactics and economic bullying in an effort to force Plaintiff to "re-negotiate" its licensed rights on terms far more favorable to Defendants – in essence, scrap a negotiated agreement that has been in operation for decades now, and re-write a new agreement to Defendants' liking.

11.     Specifically, this matter arises out of a contract between Plaintiff and defendant Body Glove IP, pursuant to which Plaintiff (as licensee) has rights to and

**COMPLAINT**

DOLL AMIR & ELEY LLP

has developed, sub-licensed, marketed, supplied, operated and managed the Body Glove brand in nearly all countries in Asia (hereafter, referred to as the "License Agreement").  Pursuant to the License Agreement, the principal of Plaintiff has spent nearly 30 years of his life introducing and building the Body Glove brand in Asia, which now generates millions of dollars per year in revenue for Defendants, Plaintiff, and Plaintiff's sub-licensees.

12.    For nearly 30 years, Plaintiff (including its predecessor in interest) had a seamless working relationship with Defendants' predecessors – a family-owned operation – and dutifully carried out all of its obligations under the License Agreement.  In 30 years of working together to build the Body Glove brand in Asian markets, Plaintiff was never accused of materially breaching the parties' License Agreement.  However, this drastically changed when, in late 2016, the founders of Body Glove sold a majority interest in their brand to defendant Marquee Brands.  By its own website description, Marquee Brands is "a brand acquisition, licensing and development company," which, on information and belief, is owned and "sponsored" by one of the world's largest private investment management firms, Neuberger Berman (a company that manages over $225 billion in client assets).

13.    After this transition from a family-owned business to one that is managed by a massive conglomerate primarily concerned with increasing their bottom line, all of the goodwill that Plaintiff had built up over the past 30 years was summarily disregarded.  Instead, soon after their acquisition, Defendants initiated a ruthless profit-driven scheme aimed at trying to squeeze Plaintiff into conceding valuable rights to Defendants, or else push Plaintiff and their sub-licensees out of this economic relationship altogether.

14.    Specifically, despite having conducted a detailed review of all of Plaintiff's license and sub-license agreements and financial records prior to taking over the Body Glove brand in November 2016, Defendants almost immediately thereafter began to issue threats of canceling the License Agreement if Plaintiff

DOLL AMIR & ELEY LLP

refused to "re-negotiate" certain material terms.  To "persuade" Plaintiff, Defendants coupled such threats with vague and clearly contrived accusations of "non-compliance" by Plaintiff, and then used such baseless and unspecified accusations as purported "justification" to obstruct Plaintiff's ability to conduct its ongoing business under the License Agreement.  Such actions, as noted below intentionally interferes with Plaintiff's ability to perform its obligations to sub-licensees.  As the License Agreement requires Defendant's approval of any new products submitted by Plaintiff, Defendants have abused this provision in bad faith (and contrary to its intent) by claiming that they cannot approve *any* products submitted by Plaintiff because Plaintiff is in "non-compliance" with the contract.  However, Defendants have refused to specify how Plaintiff was purportedly "non-compliant" or could be compliant.  In addition to refusing to review any products, Defendants have failed and refused to provide any advertising, artwork, or marketing materials or support, as required to support Plaintiff's activities and obligations under the license and sub-license agreements; have refused to approve standard filings for the authorization of Plaintiff's agents to inspect and import licensed products into Plaintiff's licensed territories; and have refused to investigate and prevent the sale of unauthorized goods in violation of Plaintiff's exclusive rights – all in a transparent effort to interfere with Plaintiff's and its sub-licensees' current and future businesses as a means for leverage.

15.    In other words, Defendants are intentionally holding the business of Plaintiff and its sub-licensees hostage in an orchestrated plan to pressure Plaintiff into re-negotiating its licensed rights to now relinquish its territories, increase its royalty percentages and payments to Defendants, and remove licensed product categories from Plaintiff's control, among other things.  Defendants' threats and willful obstruction of Plaintiff's business also have had the effect of severely hindering its performance of obligations to sub-licensees, as well as chilling Plaintiff's ongoing negotiation with a prospective buyer in Malaysia of Plaintiff's business – a

1  negotiation that Defendants were fully aware of at the time of their actions, and

2  plainly sought to stop before their License Agreement was assumed by a foreign

3  party.

4      16.    In sum, Defendants are unlawfully attempting to bully Plaintiff into

5  relinquishing valuable contract rights.  They are leveraging the threat of irreparably

6  destroying Plaintiff's business and business relationships – a life's work in building

7  the brand in Asia for the past 30 years – as a strong-arm means for bringing Plaintiff

8  to its knees and, thus, back to the bargaining table.  Defendants' actions not only

9  constitute a material breach of the contract and the covenant of good faith and fair

10 dealing, but also constitute knowing and malicious interference with Plaintiff's

11 existing and prospective business relationships.  Moreover, Defendants' actions have

12 caused and will continue to cause irreparable harm to Plaintiff's business and to the

13 Body Glove brand in the Asian markets where Plaintiff conducts its business.

14 Plaintiff, therefore, also seeks injunctive relief by this Complaint, and will soon ask

15 the Court for a temporary restraining order in this regard.

16                    **GENERAL ALLEGATIONS**

17      A. **GENERAL BACKGROUND**.

18      17.    On information and belief, the Body Glove brand was established in

19 Redondo Beach in 1953, by brothers Bob and Bill Meistrell.  According to

20 Defendant's website, what began as a venture that pioneered wetsuit technology has

21 evolved into one of the most successful and recognizable brands for outdoor sports

22 and apparel with worldwide appeal.

23      18.    Plaintiff has significantly contributed to the dramatic growth and

24 worldwide success of the brand.  Specifically, for the past 30 years, Plaintiff has

25 worked with and for the former owners of the Body Glove brand, as licensees, to

26 develop and establish markets for the brand throughout much of Asia, where the

27 brand was unknown at the time Plaintiff obtained its license.  Pursuant to a 1988

28 License Agreement (as subsequently amended), Plaintiff was authorized to exploit the

DOLL AMIR & ELEY LLP

brand throughout most countries in Asia.  Plaintiff, in turn, fulfilled its obligations and has built the Body Glove business in Asia by entering into and managing separate sub-license agreements which confer the right to the sub-licensees to develop, manufacture, market, distribute and sell products approved by Defendants.  In Thailand alone, Plaintiff currently operates over 150 retail stores dedicated to selling licensed Body Glove products through an exclusive license (a business that has been established by Plaintiff for over 25 years), as well as licenses and distribution agreements for the sales of Body Glove products in other countries within Plaintiff's licensed territories.

19.     Like any competitive market, any significant disruption in the manufacturing and approval process of the licensed Body Glove products will cause substantial – and irreparable – harm to Plaintiff's business, the sub-licensees' business, and the brand itself in those markets.  In particular, disruption of these critical processes will, on information and belief, cause fear among sub-licensees in these foreign markets, resulting in those sub-licensees abandoning the brand, competitors filling the void left by the abandoned Body Glove brand, and thereby undermining 30 years of devoted work by Plaintiff to build the brand in these countries, and causing irreparable harm to Plaintiff's business and reputation.  In addition to the above, the sale of the licensed apparel is seasonal – thus, once a shipping season has been lost, there is no possible manner in which to make up the loss of the sales and re-orders to re-supply sold out goods.  Put simply, customers will purchase another brand in the absence of the Body Glove goods they desired, causing irreparable harm.  In addition, a retailer will have relied on the goods being delivered to fill its retail store floor and fixtures, but when such goods are not delivered, it will create a gap in its sales floor, leaving valuable retail space unfilled with the intended Body Glove product.  This is particularly true for the Body Glove retail stores that exclusively sell only Body Glove products and have no other brands in which to fill its retail shelves and floor.  The Body Glove retail stores are essentially being put out

of business by Defendants' actions.  Retailers are thereafter reluctant to order new products from a licensee that cannot deliver, thus irreparably harming the brand. Further, any potential new sub-licensees will be reluctant to enter into a license agreement with the uncertainty of being able to perform in light of Defendant's actions and unlawful obstruction.

20.    According to its website, Marquee Brands considers itself to be a sophisticated expert in acquiring and developing brands worldwide, and accordingly, on information and believe, is well aware of the dire consequences of materially disrupting Plaintiff's business (and that of its sub-licensees) in its exclusive territories.

## B. RELEVANT PROVISIONS OF THE LICENSE AGREEMENT

21.    The predecessors-in-interest to both Plaintiff and Defendants entered into a contract entitled the "License Agreement," effective on approximately April 1, 1988.  The License Agreement broadly confers upon Plaintiff the exclusive right and license to use the Body Glove brand and trademarks in connection with the design, manufacture, advertisement and sale of certain Licensed Products in certain Asian territories, as defined thereafter in the contract.

### *1.  The Asian Territories Licensed to Plaintiff.*

22.    Under the original License Agreement, Plaintiff was entitled to use the Body Glove brand and trademarks only in the following territories of Asia:  Thailand, Taiwan, Hong Kong, Indonesia, Macao, Malaysia, Philippines, and Singapore.  In December 1989, the parties entered into an amendment pursuant to which the parties (Plaintiff's and Defendants' predecessors) revised the minimum annual royalty payments by Plaintiff, and specified that the Asian "territory" specified in the License Agreement shall specifically exclude Japan.

23.    On or about May 1, 1998, the original owner of the Body Glove brand and trademarks (a company called "Dive N' Surf") assigned all of its rights in the License Agreement with Plaintiff to Defendants' immediate predecessor-in-interest, Body Glove International, LLC.

DOLL AMIR & ELEY LLP

DOLL AMIR & ELEY LLP

24.     In or about January 2011, the parties further amended the License Agreement to update and confirm the contractual rights of the parties (hereafter, this amendment to the License Agreement is referred to as the "<u>2011 Amendment</u>").

25.     In the 2011 Amendment, the parties amended the definitions section of the License Agreement to the effect that the defined Asian "Territory" for exploitation by Plaintiff would now include *only* those countries and areas specified in the 2011 Amendment – which included all countries and areas previously specified in the original License Agreement, plus the following additional countries: Bangladesh, Bhutan, Brunei, Cambodia, China, India, Kazakhstan, Korea (North & South), Laos, Maldives, Mongolia, Myanmar, Nepal, Sri Lanka, Taiwan, Vietnam, India and Pakistan.

### 2. *No "Best Efforts" or "Use It or Lose It" Clause, Except as to India and Pakistan (with Cure Provisions).*

26.     Furthermore, the 2011 Amendment provided what may be characterized as a "best efforts" or "use it or lose it" clause, but *only for India and Pakistan*.  In this regard, the 2011 Amendment provides that Plaintiff must conduct some business in the India and Pakistan market, respectively, within the time periods specified in the 2011 Amendment, or else Defendants are entitled to then provide six months' notice that they intend to remove India or Pakistan from the defined Territory list.  Even then, however, the 2011 Amendment specifies that Plaintiff may "cure" any such deficiency in providing that, if Plaintiff does conclude a business transaction for the license, sale or distribution of the Licensed Productions in India or Pakistan within the six month notice period, Defendants no longer have the right to remove the India or Pakistan from the Territory list.

27.     Notably, the 2011 Amendment expressly specifies that "[t]his removal provision shall apply only to" India and Pakistan, "and no other countries in the Territory."  Further important, the parties specified that the "best efforts" clause originally written into Paragraph 12 of the License Agreement "*is hereby deleted*."

(*Id*. at 5.)  As a result of the foregoing modifications by the parties, there is no "best efforts" or "use it or lose it" requirement for any country or territory listed in the 2011 Amendment, except to the extent described above for only India and Pakistan.

### 3. The Term is Not Set to Expire for Many Years and is Self-Renewing.

28.    With the 2011 Amendment, the parties also revised Paragraph 5 of the License Agreement to now specify that term of the contract "shall continue for a period of ten (10) years from the date of this Amendment" (thus, until January 2021), and "shall automatically renew for continual successive ten (10) year periods provided that LICENSEE has met or paid the Guaranteed Annual Minimum Royalties (as herein defined) and is not otherwise in uncured material breach of the License Agreement."

### 4. Proper Notice of any Specific Breach and an Opportunity to Cure is Required.

29.    The License Agreement provides that "in the event of any breach of the agreement, the party alleging such breach shall give written notice of **the breach** to the breaching party, and shall specify a reasonable period of time within which the breaching party is to cure the breach."  In other words, "the" particular breach must be specified in the event any such notice is given with the express goal of allowing the other party to cure.

### 5. Defendants Must Provide Specific Details as the Basis for Any Disapproval of Product, While Also Suggesting Changes that Would Result in Subsequent Approval of Any Such Products.

30.    Paragraph 4 of the License Agreement extensively lays out a process for approvals of Licensed Products by Defendants.  The 2011 Amendment made important changes to such process, the gist of which is to require Plaintiff to submit all proposed designs and products bearing the Body Glove brand for Defendants' review and approval for which Defendants have the exclusive right to exercise quality

DOLL AMIR & ELEY LLP

1    control over such produces and designs, and make any reasonable changes or

2    corrections within 10 business days.

3        31.    The 2011 Amendment also added two provisions critical to this case:

4    First, the amendment provides that any failure on the part of Defendants "to reject a

5    specific design or sample within said 10-day time period shall be deemed an approval

6    of the design or sample." (*Id.*)  Second, the 2011 Amendment provides that, "If

7    [LICENSOR] does not approve any particular Licensed Product, [LICENSOR] shall

8    accompany such disapproval with a statement in writing in reasonable detail of the

9    grounds for such disapproval and suggestions for the appropriate change required to

10   the submitted item, which, if made, would result in approval." (*Id*. at p.8.)

11       32.    In other words, if Defendants refuse to approve any products or designs

12   submitted by Plaintiff, Defendants are then required to provide a *detailed* reason for

13   such disapproval and a recommended change in the product submission that would

14   lead to subsequent approval – again, the clear goal being to facilitate the ongoing

15   approval of products so that Plaintiff and its sub-licensees may seamlessly operate

16   their businesses.

17       **6. Defendants Must Provide Marketing and Promotional Support.**

18       33.    Under Paragraph 12 of the 2011 Amendment, Defendants are required to

19   provide a certain level of marketing and promotional support to Plaintiff and its sub-

20   licensees.  In particular, at Plaintiff's written request, Defendants must provide

21   design, merchandising graphics, and art work to Plaintiff "within a reasonable time"

22   of receiving such request.  Further, Defendants must maintain "a design library" that

23   is to remain available to Plaintiff and its agents and sub-licensees at all times.  In

24   addition, Defendants must "provide reasonable marketing and promotional support,

25   including promotional materials such as slides, videos, graphics, and other uses of the

26   trademarks, copyrights, designs, marketing materials, products and similar items used

27   throughout the world," to Plaintiff on a  cost basis.

28

DOLL AMIR & ELEY LLP

*7.  No Modifications to the Agreement Unless Contained in a Signed Writing.*

34.    Notably, the License Agreement provides that no waiver or modification of any terms or provisions of the Agreement are valid unless contained in a writing signed by the parties.

35.    Thus, Defendants cannot unilaterally modify the License Agreement (or their performance under the License Agreement) because they deem it unfavorable for them.

*8.  Attorneys' Fees.*

36.    Finally, the License Agreement provides that, in the event any legal action is necessary to enforce or interpret the terms of the License Agreement, the prevailing party shall be entitled to recover all reasonable attorney's fees and court costs.

C. **PLAINTIFF'S CONTRACTUAL RELATIONSHIPS WITH SUB-LICENSEES.**

37.    As noted above, Plaintiff has established longstanding licensing relationships in the Territory for the sale and distribution of licensed Body Glove products, including the operation of Body Glove-branded retail stores in the territory.

38.    Specifically, as intended and authorized under its License Agreements, Plaintiff has properly and directly entered into sub-license agreements with entities in foreign territories (neither Defendants nor their predecessors-in-interest are parties to such sub-license agreements).  These sub-license contracts  confer upon the sub-licensee rights as an exclusive sub-licensee to design, manufacture, use, duplicate, develop, market, distribute, manage, operate, sell and otherwise exploit the Body Glove trademarks in their designated Territory in accordance with the terms of the sub-license contract.  In exchange, the sub-licensee must ensure that its use of the trademarks is consistent with the quality and style maintained by Defendants, and must meet certain guaranteed performance minimums, and pay royalties in

DOLL AMIR & ELEY LLP

**COMPLAINT**

1   accordance with contractually specified percentages of Net Sales (as defined) directly

2   to Plaintiff, among other duties.

3       39.    For example, Plaintiff entered into such sub-license contract with an

4   entity now known as BGT Corporation Public Co., Ltd. (hereafter, "BGT") in or

5   about 2007, pursuant to which BGT is authorized to exploit the territories of

6   Thailand, Vietnam, Myanmar, Laos, Kampuchea (Cambodia), and the Philippines.

7   Currently, BGT operates over 150 retail stand-alone stores or shops-within-shops

8   pursuant to its sub-license agreement with Plaintiff.  These are long-term contracts

9   that self-renew in the absence of any material breach.  Plaintiff has entered into a

10  similar contract with a company in Malaysia (hereafter, "BGM"), which currently

11  operates more than 30 retail stand-alone stores or shops-within-shops in that territory

12  (together, Plaintiff's sub-license agreements with BGT and BGM account for the bulk

13  of Plaintiff's sub-license business).

14      40.    Notably, Plaintiff's contracts with such sub-licensees acknowledge that

15  the Body Glove trademarks are owned by Defendants, and that Plaintiff retains

16  exclusive rights, control, supervision, approval and consent to the use of any licensed

17  and approved products by the sub-licensees in the specified territories.  Of course,

18  such rights of approval and consent by Plaintiff are, in turn, dependent on Defendants,

19  who must in good faith review and approve of and consent to products submitted to

20  Defendants by Plaintiff under the License Agreement before such products may then

21  be exploited by approved by Plaintiff for exploitation by its sub-licensees.

22      41.    Significantly, in addition to its obligation to review and approve product

23  submissions, one of the express obligations of Plaintiff under its sub-license

24  agreements with BGT is to "[m]ake available designs, merchandising, graphics and

25  artwork, to BGT on a regular and continuing basis…"  (A similar provision exists in

26  Plaintiff's sub-license agreement with BGM.)  It follows from such provisions that

27  any disruption of Plaintiff's ability to obtain approval from Defendants for licensed

28  Body Glove products or any disruption in Plaintiff's ability to make Defendant's

DOLL AMIR & ELEY LLP

designs, merchandising, graphics and artwork available has the corollary effect of also disrupting Plaintiff's ability to meet its obligations to its sub-licensees, which expressly rely upon the "regular and continuing" flow of approved products from Plaintiff to carry out their businesses, particularly given that licensed products are in a continuous and ongoing time sensitive cycle of development, sourcing, approval, selling, manufacturing and distributing which, if broken, results in the inability to fulfill Plaintiff's contractual obligations and directly impacts the sub-licensees' ability to operate their businesses.

42.      Plaintiff is informed and believes, and upon such basis alleges, that, at all relevant times, Defendants have been fully aware of Plaintiff's relationships and contracts with its sub-licensees, reviewed all such contracts in their due diligence before acquiring a majority interest in the Body Glove brand, and therefore fully aware of the terms, conditions, and obligations under Plaintiff's contracts with such sub-licensees – including, as specified above, that such sub-license operations are dependent on Defendants' regular and ongoing approval of licensed products for use in these foreign markets, and ongoing provision of marketing and promotional support as required.  Accordingly, Defendants are and were aware that disruption or obstruction in approving licensed products and providing brand support would cause corresponding disruption and/or irreparable harm to Plaintiff's ability conduct its business with current and prospective sub-licensees.

**D. DEFENDANTS' IMPROPER AND UNLAWFUL CONDUCT**

*1. Defendants Acquire the Brand and Assume the License Agreement.*

43.      In or about November 2016, on information and belief, Marquee Brands acquired a 75% interest in the intellectual property assets of Body Glove International, LLC, which had owned all rights to the Body Glove brand and associated trademarks.  On information and belief, the original owners (the Meistrell family), retained a minority 25% interest in the Body Glove brand.  On information and belief, Marquee Brands organized a Delaware limited partnership called Body

DOLL AMIR & ELEY LLP

Glove IP Holdings LP, through which to hold the Body Glove assets and operate the business.  According to Marquee Brands' website, the Meistrell family remains a limited partner in the brand, presumably (on information and belief) through defendant Body Glove IP Holdings LP.

44.     On information and belief and prior to the acquisition, Marquee Brands conducted thorough due diligence of the Body Glove assets and business, including all of its financial arrangements.  Marquee Brands specifically reviewed and was fully aware of the License Agreement, and therefore knowingly assumed all terms and conditions of Plaintiff's License Agreement.  Analysts and lawyers from sophisticated investment giant, Neuberger Berman (which "sponsors" Marquee Brands), were heavily involved in these due diligence efforts – thus, Marquee Brands had a group of sophisticated lawyers and financial analysts scouring Body Glove's financial arrangements and licensing agreements with Plaintiff and others before agreeing to the acquisition.  In fact, Plaintiff participated in due diligence calls with executives of both Marquee Brands and Neuberger prior to the closing of the acquisition.

45.     On information and belief, in acquiring the Body Glove assets and brand, Marquee Brands assumed the License Agreement and all associated obligations under such Agreement.

### 2.  Defendants Trump Up Various "Breaches" of the License Agreement as a Basis for Garnering Leverage to "Re-Negotiate" on More Favorable Terms.

46.     Shortly after acquiring a majority interest in the Body Glove brand, and assuming the License Agreement, Defendants began to express their dissatisfaction with the terms of the License Agreement to Plaintiff.  In meetings and/or communications among the parties, employees of Marquee Brands expressed to Plaintiff that they wanted to retract certain countries from the Territory and essentially reinsert the "best efforts" or "use it or lose it" provisions that the parties mutually agreed to delete in the 2011 Amendment.  The President of Marquee Brands even

DOLL AMIR & ELEY LLP

complained that he could not believe there was no "use it or lose it" provision in the License Agreement, and never would have agreed to this, thus having full knowledge of the ramifications of this fact.  Defendants also expressed to Plaintiff that they are unhappy with the royalty split in the License Agreement and subsequently demanded that Plaintiff agree to change the royalty split so that Defendants would receive a larger, if not majority, percentage of the royalties.

47.    Given Plaintiff's significant investment of financial resources and time to build the Body Glove brand in its Territory over the last 30 years, it had no reason to undermine its own business by unilaterally re-writing the royalty split or removing countries within its Territory.  For this reason, Plaintiff did not agree to Defendants' initial suggestions or desire to renegotiate the License Agreement terms which it has relied upon in making its financial investments in the Body Glove brand, particularly given that Plaintiff had been restricted from expanding the brand in some countries due to Body Glove's failure to secure the proper intellectual property rights for the brand in countries within Plaintiff's Territory.  On information and belief, Defendants thereafter commenced a scheme that would either force Plaintiff to "re-negotiate" the License Agreement to Defendants' liking, or else have their 30-year business destroyed by Defendants' refusal to perform its obligations according to the License Agreement terms.  Defendants began to unleash this strong-arm campaign during meetings and conversations among the parties in or about April 13, 2017, at which time Defendants expressed their demand for the return of certain countries within Plaintiff's licensed territories and a more favorable royalty payment to Defendants.

48.    Soon after the acquisition and being rebuffed in their initial demand to pressure Plaintiff into re-negotiating their rights, Defendants began to threaten cancellation of the contract for "substantial non-compliance" of the License Agreement terms.  Given the fact that these accusations came shortly after Plaintiff declined to re-work many aspects of the contract to Defendants' liking, Plaintiff apprised Defendants of its position with respect to Defendant's accusations by letter of

DOLL AMIR & ELEY LLP

May 12, 2017 and advised Marquee Brands of the serious consequences of interference with Plaintiff's business and then-ongoing negotiations with a Malaysian company to purchase Plaintiff's business.

49.    Defendants eventually responded by threatening to tie up Plaintiff's License Agreement on the basis of claiming alleged "breaches" of the agreement if their demands were not met.  Defendants made good on such threats by issuing a contrived "Notice of Default" on May 17, 2017, in which Defendants claimed in the vaguest possible terms that Plaintiff had "fail[ed] to adhere to the product approval process outlined in the License Agreement."  Defendants vaguely claimed that Plaintiff was guilty of an "ongoing breach of the product and store opening approval process," and that they considered "such actions to be a material breach of the License Agreement," despite the fact that such stores had been in operation for over 25 years and were used by Defendants' predecessor-in-interest in Body Glove marketing materials.  Defendants further accused Plaintiff of improperly allowing a sub-licensee in Thailand to incorporate a Body Glove trademark into its company name in violation of the License Agreement, despite the fact that the use was previously approved by their predecessor and the use of the name was ultimately removed from the corporate name many years before Defendant's acquisition of the brand.  Defendants also claimed that they are "in the process of launching a review of Licensee's historical adherence to…fulfilling its obligations under the 'Best Efforts' clause'" of the License Agreement – presumably, to try to come up with some basis for their accusations, given that any "Best Efforts" clause *was expressly deleted from the License Agreement* by mutual agreement of the parties in 2011.

50.    Perhaps the best evidence of Defendants' "Notice of Default" as a bad faith charade is the deliberate vagueness and lack of specificity of the supposed "breaches" by Plaintiff.  Contrary to the requirements of the License Agreement for such Notice to specify "the breach," Defendants merely suggest, in the haziest possible language, that Plaintiff has failed to follow approval procedures.  Despite

DOLL AMIR & ELEY LLP

multiple requests for clarification of the nature of the supposed breach (so that Plaintiff could cure any possible breach), Defendants failed to specify or explain the alleged breach in question, offered no specific instances of any such breach, and offered no suggestions to remedy the alleged breaches, thereby rendering it impossible to cure any such supposed "breaches" under the License Agreement.

51.     Upon information and belief, Plaintiff believes that Defendants fabricated the notion of any material "breach" and, further, had no interest in properly allowing Plaintiff to "cure" any such alleged breach.  Rather, Defendants sought to use this "Notice of Default" as yet another means to bully Plaintiff to unilaterally give up its License Agreement rights, with Marquee Brands' corporate counsel stating his hope to reach a "mutually agreeable resolution" that "avoids litigation."

52.     Plaintiff responded on June 2, 2017, noting the vagueness (and falseness) of Defendants' accusation, and requested clarification of the specific instances of the alleged "failure to follow the approval process" so that it may cure any such alleged breaches, as contemplated by the License Agreement.

53.     Perhaps the most telling evidence of Defendants' transparent scheme, however, is shown by their response to Plaintiff's letter.  By written reply, after Plaintiff demanded further specifics from Defendants in accordance with their contract, Defendants doubled down on their previous vagueness by claiming, in equally vague fashion, that "we have many examples" of alleged breaches of the approval processes and "would be happy to provide examples of such to you forthwith" – but never provided *any* examples thereafter.  Instead, in an implicit admission that Defendants have no basis at all for their accusations, Defendants advised that they are currently "researching the history" of the relationship with Plaintiff (in a clear effort to try to *manufacture* some, any, basis for gaining leverage on Plaintiff), and until such time as Defendants can find some basis for their accusations, they were suspending all approvals of products submitted by Plaintiff.

DOLL AMIR & ELEY LLP

54.   In sum, because Defendants have been unable to provide any valid basis for Plaintiff to re-negotiate the License Agreement to their liking, Defendants decided to purposely block all further licensing business conducted by Plaintiff (and its sub-licensees) going forward in a last-ditch effort to force capitulation to their demands. Indeed, by letter of June 12, 2017, Defendants openly admit their unlawful obstruction of these businesses in stating that, because of Plaintiff's (unspecified) "disregard for the approval process," and because the (unspecified) products offered without approval are "so varied and numerous," Defendants have unilaterally determined that the "only way to re-establish an orderly and efficient approval system would be to declare all Licensed Products currently offered for sale by [Plaintiff] or its sub-licensees, to be disapproved and require that [Plaintiff] re-submit them all for approval." Defendants, thus, declared that they are "suspending all product approvals until we can better understand the extent of the issue."

55.   Consistent with this communication, the record shows that Defendants are now systematically refusing to approve *any* licensed products or designs submitted by Plaintiff for use by Plaintiff and/or its sub-licensees. Even more egregious, the purported "justification" given by email in response to each product submittal by Plaintiff is the same contrived pat answer that, "We cannot approve any further submissions while your contract status is unresolved and currently in breach." This, of course, is in bad faith given that (a) Plaintiff's "contract status" is not "unresolved" in the least (there is an ongoing and valid contractual relationship), and (b) Defendants have refused to provide a single example of any "breach," despite Plaintiff's multiple demands for the same.

56.   The foregoing responses from Defendants are not only contrived in bad faith, but violate the express terms of the License Agreement. Specifically, upon any rejection of a submitted product, Defendants are required to particularize in writing and with "reasonable detail" the specific basis for such disapproval along with "suggestions for the appropriate change required to the submitted item" that would

then result in approval. Here, because Defendants plainly fabricated their accusation of "non-compliance," they have failed and refused to comply with the foregoing requirement to specify why such products are being disapproved, why Plaintiff is in non-compliance at all, or offer any suggestions for changing the submitted item to obtain approval and keep these businesses running, as contemplated by the contract.

57.   In fact, Defendants are now refusing to perform any of their material obligations under the License Agreement. Thus, in addition to unilaterally freezing all product approval in violation of the contract, Defendants also have failed and refused to fulfill their contractual obligations to provide the necessary marketing and promotional support, to provide customary authorizations for shipment of product, or to prevent the unauthorized sale of Body Glove products in countries that Defendants know are within Plaintiff's contractually licensed territories.

58.   Most egregious, it is clear that Defendants have taken this course of action – *i.e.*, unilaterally freezing all product approval, shipment authorization, and marketing support – while knowing that such obstruction not only impedes Plaintiff's ability to operate its business under the License Agreement, but also prevents Plaintiff from performing its obligations to its sub-licensees (and, thus, knowingly disrupts and potentially destroys the businesses of Plaintiff's sub-licensees, all of whom depend on a "regular and continuing" stream of approved products and marketing support from Plaintiff – by way of Defendants – to keep their sub-licensed operations running). Defendants are fully aware that their tactics are jeopardizing the continued operation of nearly 200 retail stores in Thailand and Malaysia, which, as described above, cannot survive without the continued flow of sufficient products to market and sell, or proper brand support (as these stores exclusively market and sell Body Glove products).

59.   Through the bad faith misuse of their contractual discretion on all product approval, Defendants are holding hostage the entire businesses of Plaintiff and its sub-licensees – threatening to destroy Plaintiff's life's work in building up the

Body Glove brand in Asia for the past 30 years – as a means for bullying Plaintiff into relinquishing its own valid and valuable rights to Defendants.

60.     The foregoing conduct by Defendants has had an immediate and significant impact on Plaintiff's current and future business relationships, including with manufacturers and sub-licensees in Asian markets.

61.     Moreover, much of the harm to Plaintiff, its sub-licensees, and to the Body Glove brand, is irreparable.  As detailed earlier, competitors will immediately move in to fill the void created by Defendants' total freeze of the manufacturing and sale of Body Glove products in Plaintiff's territory, leaving Plaintiff unable to re-gain the market share that it built up over the past 30 years in such markets.  Such irreparable harm also extends to the retail stores in the territory (including Thailand and Malaysia, with approximately 200 retail stores combined), threatening the very existence of these stores and retail operations in a very challenging market – stores that employ hundreds of individuals and generate over $30 million in annual sales – and all but precluding any prospective sub-licensee relationships from being consummated.

62.     Defendants' economic bullying scheme to trump up false accusations of "breach," combined with threats of litigation and obstruction of Plaintiff's (and its sub-licensees') business, are unlawful on multiple grounds set forth below. Moreover, the evidence makes clear that Defendants deliberately, maliciously, fraudulently, and oppressively, instituted their scheme, and exemplary damages are therefore warranted.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract Against All Defendants)

63.     Plaintiff re-alleges each and every allegation set forth in paragraphs 1 through 62, above, and incorporates them herein by this reference.

64.     On or about April 1, 1988, Plaintiff's and Defendants' predecessors-in-interest entered into a contract entitled "License Agreement" pursuant to which the

licensee secured the right to use the Body Glove brand in connection with the design, manufacture, advertisement and sale of certain licensed products in certain countries in Asia, as specified in the contract.  On or about December 11, 1989, Plaintiff's and Defendants' predecessors-in-interest entered into an amendment to the License Agreement.  Plaintiff then entered into another amendment with Defendants' predecessor-in-interest, effective January 1, 2011.  The material terms to the foregoing agreements have been alleged in detail above and are incorporated herein.

65.     Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the License Agreement, except those obligations that were waived by Defendants or which Plaintiff was excused or prevented from performing.

66.     Defendants have breached the License Agreement with Plaintiff in the manners alleged in detail above.

67.     After Plaintiff learned of the contract violations by Defendants, Plaintiff and its counsel have requested that Defendants perform its contractual obligations under the License Agreement, as detailed above.

68.     Despite these requests, Defendants have failed and refused to honor or perform its contractual obligations to Plaintiff.

69.     As a proximate result of Defendants' breach, as alleged herein, Plaintiff has suffered damages in an amount to be proven at trial which far exceeds the jurisdictional amount, plus statutory interest.

70.     The License Agreement also provides that the prevailing party, in any action commenced to enforce or interpret the terms of the License Agreement, is entitled to recover all reasonable attorney's fees and court costs.  Plaintiff therefore will seek such recovery of all reasonable costs and expenses in addition to the compensatory damages described above.

71.     Plaintiff further requests issuance of a temporary, preliminary, and permanent injunction against Defendants, and anyone acting in concert with

DOLL AMIR & ELEY LLP

1  Defendants or at their direction and management, to enjoin Defendants from
2  continuing to engage in the unlawful conduct which is causing irreparable harm to
3  Plaintiff's business and to the Body Glove brand, by maintaining the status quo of the
4  relationship of the parties during the course of this action.

**SECOND CLAIM FOR RELIEF**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing**

**Against All Defendants)**

72.    Plaintiff alleges each and every allegation set forth in paragraphs 1 through 62, above, and incorporates them herein by this reference.

73.    Every contract contains an implied covenant of good faith and fair dealing.  Each party to a contract is thereby obligated to act in good faith at all times in performing the contract and refrain from doing anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

74.    Here, as alleged in detail above, Defendants committed numerous acts that unfairly interfered with, and effectively prevented, Plaintiff's performance under the contract, thereby depriving Plaintiff of the benefits of the License Agreement and constituting a violation of the covenant of good faith and fair dealing implied in the License Agreement.

75.    The examples include but are not limited to those instances alleged above, such as Defendants' bad faith contrivance of vague and unsupported accusations of "non-compliance" as purported justification for refusing to approve any products submitted by Plaintiff pursuant to the approval procedure outlined in the License Agreement – in an effort to force Plaintiff to "re-negotiate" the License Agreement by holding Plaintiff's business "hostage."

76.    As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount to be proven at trial which far exceeds the jurisdictional amount, plus statutory interest.

DOLL AMIR & ELEY LLP

77.     The License Agreement also provides that the prevailing party, in any action commenced to enforce or interpret the terms of the License Agreement, is entitled to recover all reasonable attorney's fees and court costs.  Plaintiff therefore will seek such recovery of all reasonable costs and expenses in addition to the compensatory damages described above.

78.     Plaintiff further requests issuance of a temporary, preliminary, and permanent injunction against Defendants, and anyone acting in concert with Defendants or at their direction and management, to enjoin Defendants from continuing to engage in the unlawful conduct which is causing irreparable harm to Plaintiff's business and to the Body Glove brand.

## THIRD CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relations

### Against Defendant Marquee Brands, and Does 1-25)

79.     Plaintiff re-alleges each and every allegation set forth in paragraphs 1 through 62, above, and incorporates them herein by this reference.

80.     Plaintiff has a valid existing contract with defendant Body Glove IP Holdings, LP.

81.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, defendant Marquee Brands, as a controlling majority shareholder of Body Glove IP Holdings, LP, knew of the existence of this contractual relationship and the economic benefits that Plaintiff derives from these contractual relationships.

82.     Plaintiff is informed and believes, and on that basis alleges, that Marquee Brands intended to disrupt this contractual relationship.

83.     Plaintiff is informed and believes, and on that basis alleges, that Marquee Brands' conduct, as alleged above, prevented performance of the License Agreement, or made performance more expensive or difficult.  Specifically, as alleged on information and belief, Marquee Brands has acted to disrupt and undermine the License Agreement by, among other things, directing employees of Body Glove IP

Holdings, LP, to refuse approval of any and all new products submitted by Plaintiff pursuant to the License Agreement, and to do so without sufficient explanation or opportunity to remedy required by the contract which has then deprived Plaintiff of its contractual right to cure any supposed breach.

84.     As a direct and proximate result of the alleged conduct of Marquee Brands, Plaintiff has been damaged.  The exact amount of Plaintiff's injury has not yet ascertained, but will be proven at trial in this action and exceeds the jurisdictional minimum.

85.     Plaintiff is informed and believes, and on such basis alleges, that Plaintiff's unjustified conduct was and is a substantial factor in causing Plaintiff's harm.

86.     In committing the foregoing acts described herein, Marquee Brands has acted with oppression, fraud, and/or malice.  In particular, the record shows that this obstruction of Plaintiff's business, as ordered by Marquee Brands, is a deliberate and unlawful attempt to pressure Plaintiff into re-negotiating the License Agreement and obtain more favorable terms for Defendants.  Plaintiff, therefore, is entitled to an award of punitive damages against Marquee Brands pursuant to California Civil Code section 3294.

87.     Marquee Brands has attempted and, unless enjoined, will continue to intentionally disrupt Plaintiff's contractual relationship with Body Glove IP Holdings, LP.  Plaintiff will continue to suffer irreparable injury unless the Court restrains Marquee Brands' wrongful conduct.

## FOURTH CLAIM FOR RELIEF

**(Intentional Interference with Prospective Economic Advantage Against All Defendants)**

88.     Plaintiff re-alleges each and every allegation set forth in paragraphs 1 through 62, above, and incorporates them herein by this reference.

DOLL AMIR & ELEY LLP

89.     There exists a prospective economic relationship between and among Plaintiff and the Malaysian company known as Yen Global Berhad.  As of March 28, 2017, Plaintiff and Yen Global Berhad had entered into a letter of intent pursuant to which Yen Global Berhad would acquire a majority interest in Plaintiff's assets, including the License Agreement, and for which Yen Global Berhad would pay a substantial sum (millions of dollars) to Plaintiff.  Plaintiff reasonably expected this prospective economic relationship to be consummated.  Thus, there was a probability of future economic benefit from this prospective economic relationship.

90.     Plaintiff is informed and believes, and on such basis alleges, that Defendants were, at all relevant times, aware of the existence of this prospective economic relationship and the probability of the future economic benefits that Plaintiff would derive from such relationship.

91.     Plaintiff is informed and believes, and on such basis alleges, that Defendants, with the intent to injure Plaintiff, has undertaken a series of actions, as alleged above, designed to intentionally interfere, disrupt, and/or prevent Plaintiff's prospective economic relationship.

92.     Plaintiff is informed and believes, and on such basis alleges, that Defendants' actions alleged herein were independently wrongful separate from the interference itself because, among other things, Defendants have violated the License Agreement and the underlying covenant of good faith and fair dealing in the manner alleged above, and defendant Marquee Brands deliberately and unjustifiably interfered with the License Agreement.

93.     As a direct and proximate result of Defendants' conduct, as alleged herein, Plaintiff's prospective economic relationship has been disrupted and Plaintiff has suffered damages in an amount to be proven at trial which far exceeds the jurisdictional amount, plus statutory interest

DOLL AMIR & ELEY LLP

94.     Plaintiff is informed and believes, and on such basis alleges, that Defendants' wrongful conduct was and is a substantial factor in causing Plaintiff's harm.

95.     In committing the foregoing acts described herein, Defendants acted with oppression, fraud, and/or malice.  In particular, the record shows that Defendants purposely obstructed Plaintiff's business and threatened legal action in a deliberate attempt to pressure Plaintiff into re-negotiating the License Agreement and obtain more favorable terms for Defendants, and also prevent Plaintiff from consummating any agreement with Yen Global Berhad pursuant to which the License Agreement, in its present form, would be assumed by Yen Global Berhad.  Plaintiff, therefore, is entitled to an award of punitive damages against Marquee Brands pursuant to California Civil Code section 3294.

96.     Defendants have attempted and, unless enjoined, will continue to intentionally disrupt Plaintiff's contractual relationship with Yen Global Berhad. Plaintiff will continue to suffer irreparable injury unless the Court restrains Defendants' wrongful conduct.

## FIFTH CLAIM FOR RELIEF

**(Intentional Interference with Contractual Relations with Sub-Licensees Against All Defendants)**

97.     Plaintiff re-alleges each and every allegation set forth in paragraphs 1 through 62, above, and incorporates them herein by this reference.

98.     Plaintiff has valid existing, long-term contracts with sub-licensees in the Asian Territories defined under the License Agreement, including with BGT and BGM.

99.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, Defendants knew of the existence of these contractual relationships and the economic benefits that Plaintiff derives from these contractual relationships.

100.   Plaintiff is informed and believes, and on that basis alleges, that Defendants intended to disrupt these contractual relationships.

101.   Plaintiff is informed and believes, and on that basis alleges, that Defendants' conduct, as alleged above, prevented performance of Plaintiff's sub-license agreements, or made performance more expensive or difficult.

102.   As a direct and proximate result of the alleged conduct of Defendants, Plaintiff has been damaged.  The exact amount of Plaintiff's injury has not yet ascertained, but will be proven at trial in this action and exceeds the jurisdictional minimum.

103.   Plaintiff is informed and believes, and on such basis alleges, that Plaintiff's unjustified conduct was and is a substantial factor in causing Plaintiff's harm.

104.   In committing the foregoing acts described herein, Defendants have acted with oppression, fraud, and/or malice.  In particular, the record shows that Defendants' obstruction of Plaintiff's business with the sub-licensees was and is pre-meditated and a deliberate and unlawful attempt to pressure Plaintiff into re-negotiating the License Agreement to obtain more favorable terms for Defendants. Plaintiff, therefore, is entitled to an award of punitive damages against Defendants pursuant to California Civil Code section 3294.

105.   Defendants have attempted and, unless enjoined, will continue to intentionally disrupt Plaintiff's contractual relationship with its sub-licensees. Plaintiff will continue to suffer irreparable injury unless the Court restrains Defendants' wrongful conduct.

## SIXTH CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage With Sub-Licensees Against All Defendants)

106.   Plaintiff re-alleges each and every allegation set forth in paragraphs 1 through 62, above, and incorporates them herein by this reference.

DOLL AMIR & ELEY LLP

**COMPLAINT**

107.   There exists a prospective economic relationship between and among Plaintiff and sub-licensees in the Territories defined by the License Agreement, including Plaintiff's existing, long-term and self-renewing contracts with BGT and BGM in Thailand and Malaysia, respectively, as well as current and/or prospective relationships with other sub-licensees in other territories.  There existed a probability of future economic benefits to Plaintiff resulting from these prospective economic relationships.

108.   Plaintiff is informed and believes, and on such basis alleges, that Defendants were, at all relevant times, aware of the existence of these prospective economic relationships and the probability of the future economic benefits that Plaintiff would derive from such relationships.

109.   Plaintiff is informed and believes, and on such basis alleges, that Defendants, with the intent to injure Plaintiff, has undertaken a series of actions, as alleged above, designed to intentionally interfere, disrupt, and/or prevent Plaintiff's prospective economic relationships with current and prospective sub-licensees.

110.   Plaintiff is informed and believes, and on such basis alleges, that Defendants' actions alleged herein were independently wrongful separate from the interference itself because, among other things, Defendants have violated the License Agreement and the underlying covenant of good faith and fair dealing in the manner alleged above, Defendants have deliberately and unjustifiably interfered with Plaintiff's current contractual relationships with its sub-licensees, and defendant Marquee Brands deliberately and unjustifiably interfered with the License Agreement for the unlawful purposes alleged herein.

111.   As a direct and proximate result of Defendants' conduct, as alleged herein, Plaintiff's prospective economic relationships have been disrupted and Plaintiff has suffered damages in an amount to be proven at trial which far exceeds the jurisdictional amount, plus statutory interest

112.   Plaintiff is informed and believes, and on such basis alleges, that Defendants' wrongful conduct was and is a substantial factor in causing Plaintiff's harm.

113.   In committing the foregoing acts described herein, Defendants acted with oppression, fraud, and/or malice.  In particular, the record shows that Defendants purposely obstructed the operation of Plaintiff's sub-license agreements in a deliberate attempt to pressure Plaintiff into re-negotiating the License Agreement and obtain more favorable terms for Defendants, and prevent Plaintiff from consummating any agreement with Yen Global Berhad pursuant to which the License Agreement, in its present form, would be assumed by Yen Global Berhad.  Plaintiff, therefore, is entitled to an award of punitive damages against Marquee Brands pursuant to California Civil Code section 3294.

114.   Defendants have attempted and, unless enjoined, will continue to intentionally disrupt Plaintiff's prospective economic relationships with sub-licensees in the manner described herein.  Plaintiff will continue to suffer irreparable injury unless the Court restrains Defendants' wrongful conduct.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants)

115.   Plaintiff re-alleges each and every allegation set forth in paragraphs 1 through 62, above, and incorporates them herein by this reference.

116.   Plaintiff is an interested party in the validity and enforcement of the provisions of the License Agreement, where there exists an actual controversy relating to the legal rights and duties of the parties.

117.   Plaintiff therefore seeks a declaration of rights and duties of the parties under the License Agreement.

DOLL AMIR & ELEY LLP

**COMPLAINT**

**DOLL AMIR & ELEY LLP**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

### **First Claim for Relief**

1.      For an award of compensatory damages according to proof, together with interest permitted by law;

2.      For an award of attorney's fees pursuant to Paragraph 26(c) of the License Agreement; and

3.      For an order temporarily, preliminarily, and permanently enjoining Defendants, their employees, agents, and anyone acting in concert or participation with them, from engaging in any of the unlawful acts alleged herein.

### **Second Claim for Relief**

1.      For an award of compensatory damages according to proof, together with interest permitted by law;

2.      For an award of attorney's fees pursuant to Paragraph 26(c) of the License Agreement; and

3.      For an order temporarily, preliminarily, and permanently enjoining Defendants, their employees, agents, and anyone acting in concert or participation with them, from engaging in any of the unlawful acts alleged herein.

### **Third Claim for Relief**

1.      For an award of compensatory damages according to proof, together with interest permitted by law;

2.      For an order temporarily, preliminarily, and permanently enjoining Defendants, their employees, agents, and anyone acting in concert or participation with them, from engaging in any of the unlawful acts alleged herein.

3.      For an award of punitive damages against defendant Marquee Brands pursuant to California Civil Code section 3294.

**Fourth Claim for Relief**

1.      For an award of compensatory damages according to proof, together with interest permitted by law;

2.      For an order temporarily, preliminarily, and permanently enjoining Defendants, their employees, agents, and anyone acting in concert or participation with them, from engaging in any of the unlawful acts alleged herein.

3.      For an award of punitive damages against defendant Marquee Brands pursuant to California Civil Code section 3294.

**Fifth Claim for Relief**

1.      For an award of compensatory damages according to proof, together with interest permitted by law;

2.      For an order temporarily, preliminarily, and permanently enjoining Defendants, their employees, agents, and anyone acting in concert or participation with them, from engaging in any of the unlawful acts alleged herein.

3.      For an award of punitive damages against defendant Marquee Brands pursuant to California Civil Code section 3294.

**Sixth Claim for Relief**

1.      For an award of compensatory damages according to proof, together with interest permitted by law;

2.      For an order temporarily, preliminarily, and permanently enjoining Defendants, their employees, agents, and anyone acting in concert or participation with them, from engaging in any of the unlawful acts alleged herein.

3.      For an award of punitive damages against defendant Marquee Brands pursuant to California Civil Code section 3294.

**Seventh Claim for Relief**

1.      For a declaration that Plaintiff is in full compliance of the License Agreement and that Defendants' allegations of breach are without basis.

///

**COMPLAINT**

DOLL AMIR & ELEY LLP

# ALL CAUSES OF ACTION

1.    For Plaintiff's costs of suit herein; and

2.    For all such other and further relief as the Court deems just and proper.

DATED:  August 21, 2017          DOLL AMIR & ELEY LLP


                                 By: /s/ Michael M. Amir
                                      MICHAEL M. AMIR
                                      JASON B. BAIM

                                 Attorneys for Plaintiff IP Global
                                 Investments America, Inc.


# REQUEST FOR A JURY TRIAL

Plaintiff IP Global Investments America, Inc. requests a jury trial.

DATED:  August 21, 2017          DOLL AMIR & ELEY LLP


                                 By: /s/ Michael M. Amir
                                      MICHAEL M. AMIR
                                      JASON B. BAIM

                                 Attorneys for Plaintiff IP Global
                                 Investments America, Inc.

**COMPLAINT**